WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bruce P Murchison,<br><br>      Plaintiff,<br><br>v.<br><br>Commissioner of Social Security Administration,<br><br>      Defendant. | No. CV-17-00142-TUC-EJM<br><br>**ORDER** |

Plaintiff Bruce P. Murchison ("Murchison") brought this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social Security ("Commissioner"). Murchison raises two issues on appeal arguing that the Administrative Law Judge's ("ALJ") decision was not based on substantial evidence because: 1) the ALJ did not properly evaluate the medical evidence from Murchison's treating physicians, Dr. Rogers and Dr. Puri; and 2) the ALJ's hypothetical to the Vocational Expert ("VE") did not include all of Murchison's limitations. (Doc. 17 at 4).

Before the Court are Murchison's Opening Brief, Defendant's Response, and Murchison's Reply. (Docs. 17, 19, & 22). The United States Magistrate Judge has received the written consent of both parties and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure. For the reasons stated below, the Court finds that the Commissioner's decision should be affirmed.

## I.  Procedural History

Murchison filed an application for Disability Insurance Benefits ("DIB") on

September 17, 2012. (Administrative Record ("AR") 59). Murchison alleged disability beginning on May 2, 2012 based on narcolepsy and chronic fatigue. *Id*. Murchison's application was denied upon initial review (AR 57, 73) and on reconsideration (AR 75, 90). A hearing was held on February 19, 2015 (AR 26), after which ALJ Mary P. Parnow found, at Step Four, that Murchison was not disabled because he was able to perform his past relevant work ("PRW") as a high school and college teacher. (AR 22). On January 26, 2017 the Appeals Council denied Murchison's request to review the ALJ's decision. (AR 1).

Murchison's date last insured ("DLI") for DIB purposes is December 31, 2016. (AR 171). Thus, in order to be eligible for benefits, Murchison must prove that he was disabled during the time period of his alleged onset date ("AOD") of May 2, 2012 and his DLI of December 31, 2016.

## II. Factual History

Murchison was born on October 5, 1967 making him 44 at the AOD of his disability. (AR 59). Murchison earned a Master's Degree in Education Administration (AR 33) and completed law school but did not pass the Arizona bar exam (AR 221). He worked primarily as a high school teacher from 1992–2012 (AR 34, 175) and also worked as an adjunct professor at Pima Community College and delivered pizzas part-time (AR 34).

### A. Treating Physicians[1]

On May 12, 2010 Murchison was seen by Dr. Puri at Pima Lung & Sleep for a narcolepsy evaluation. (AR 252). Murchison reported that he had an abnormal polysomnogram during training for the National Guard so he was told to see a sleep specialist. Murchison stated that he had no daytime problems, that his sleep was not restorative, and that he occasionally felt weak and had cataplexy. He also reported trouble driving and nearly rear-ending other cars. Dr. Puri's diagnosis was narcolepsy-cataplexy

---

[1] While the relevant period for establishing disability is May 2, 2012 to December 31, 2016, the undersigned has reviewed all of the medical evidence of record.

syndrome, with extremely mild cataplexy.[2] (AR 253). Dr. Puri prescribed Provigil and recommended a repeat polysomnogram with multiple sleep latency tests and a urine toxicology screen.

On December 8, 2010 Murchison saw Dr. Puri for a follow-up. (AR 249). Dr. Puri noted that Murchison had multiple sleep latency tests on November 13, 2010 which showed an abnormal mean sleep onset latency of 8.7 minutes. Murchison's insurance did not cover the Provigil so it was changed to Nuvigil; Murchison reported it worked for three or four days and then the effect wore off. He took it for 30 days and had no improvement in daytime sleepiness. Murchison reported that he became drowsy at work but had not fallen asleep, and also became drowsy while driving and would pull over. He did not have any episodes of cataplexy or sleep paralysis. Dr. Puri assessed narcolepsy with cataplexy syndrome and noted Murchison was not currently having any cataplectic episodes but was hypersomnolent.[3] (AR 250). Dr. Puri increased the Nuvigil dosage and noted that if it did not work, he might have to add another medication or change the prescription to Provigil. Dr. Puri also suggested strategic naps could help but noted that Murchison could not nap while teaching.

On February 9, 2011 Murchison saw Dr. Puri for a follow-up. (AR 245). Murchison had dizziness, headaches, and nausea from the increased Nuvigil, so Dr. Puri stopped the medication. With no medication, Murchison had increased hypersomnia and difficulty driving. Dr. Puri noted that since the Nuvigil did not work, they would petition the insurance company to cover the Provigil. Dr. Puri assessed narcolepsy without cataplexy, currently with significant hypersomnia. (AR 246). Dr. Puri also completed a form for the Tucson Unified School District noting that Murchison's condition caused him to become "profoundly sleepy" and recommending that Murchison be transferred to

---

[2] "Cataplexy is a sudden and uncontrollable muscle weakness or paralysis that comes on during the day and is often triggered by a strong emotion, such as excitement or laughter." https://sleepfoundation.org/narcolepsy/content/cataplexy

[3] "Hypersomnolence is characterized by recurrent episodes of excessive daytime sleepiness or prolonged nighttime sleep that is not restorative." https://www.psychologytoday.com/conditions/hypersomnolence

a school closer to home so that he could either walk or drive a shorter distance to work. (AR 244).

On March 16, 2011 Murchison saw Dr. Puri for a follow-up. (AR 242). Murchison was taking Provigil twice a day and reported that he was doing better and was more alert, and wanted to continue the medication. He was still occasionally sleepy while driving but did not have any accidents. Dr. Puri assessed narcolepsy without cataplexy and with significant hypersomnia, improved with Provigil. (AR 243).

On June 16, 2011 Murchison had a follow-up with Dr. Puri and reported he was not using Provigil routinely and had chronic headaches; he thought the Provigil made the headaches worse but also wanted to continue using it because it helped his narcolepsy. (AR 240). Dr. Puri recommended Murchison decrease his morning dose of Provigil and skip the afternoon dose unless he needed it, and also noted they could try different medications. (AR 241).

On August 4, 2011 Dr. Puri noted Murchison was doing fairly well, was only using Provigil on an as needed basis, and did not have any cataplexy. (AR 238). Murchison reported he was still fighting to be transferred to a school closer to his home. Dr. Puri assessed narcolepsy with cataplexy, well controlled, continue Provigil. (AR 239).

On March 21, 2012 Murchison saw Dr. Puri and reported that he was doing well but felt his narcolepsy was worsening because he felt like he was falling asleep in class and having trouble staying awake. (AR 236). He was taking Provigil three to four times a week when feeling tired. The school district would not transfer him to a school closer to his house. Murchison also reported headaches not always associated with Provigil. (AR 237). Dr. Puri assessed narcolepsy without cataplexy and recommended Murchison take his Provigil consistently and resume the afternoon dose if having symptoms.

On May 1, 2012 Murchison was seen by Dr. Rogers at El Dorado Internal Medicine with a complaint of extreme fatigue and headaches, and requested that Dr. Rogers fill out his FMLA paperwork. (AR 267). Murchison reported falling asleep in

class while teaching and in his car in a parking lot. Dr. Rogers completed the forms and noted Murchison would continue Provigil and consider a trial of Ritalin or another medication if the Provigil was not effective.

On May 5, 2012 Murchison saw Dr. Puri and reported that he did not feel good; he felt like he was going to pass out when lecturing and the Provigil was still giving him headaches. (AR 234). Dr. Puri assessed headaches, possibly related to Provigil but also antedate it and occur before taking the pill, and episodes of pre syncope, not consistent with cataplexy. Dr. Puri also assessed narcolepsy without cataplexy and discussed other medication options with Murchison. (AR 235).

On May 16, 2012 Murchison saw Dr. Rogers for a physical. (AR 265). He reported episodes of falling asleep during the day, and noted that he applied for disability but was denied.

On June 11, 2012 Murchison saw Dr. Puri and reported concerns with his Ritalin and Provigil and thought there might be something wrong with him neurologically. (AR 230). The Ritalin helped him concentrate but the Provigil did not give him the benefits he wanted. Murchison also reported headaches, occasional ataxia, and hypersomnolence in class. Dr. Puri assessed headaches and narcolepsy without cataplexy, recommended Murchison continue with Provigil and Ritalin, and referred him to a neurologist. (AR 231).

On June 18, 2012 Murchison was seen at the Center for Neurosciences for a consultation for new medications for his narcolepsy. (AR 260). He reported difficulty staying awake starting four years ago; Provigil helped initially but then stopped working, Nuvigil gave him headaches, and Ritalin did not keep him awake but allowed him to concentrate slightly better. Murchison reported some memory loss but no depression. (AR 261). The impression was narcolepsy without cataplexy, and Dr. Badruddoja recommended a MRI and bloodwork. (AR 262).

On July 30, 2012 Murchison had a follow-up at the Center for Neurosciences. (AR 258). He reported continuing difficulty with his narcolepsy but was otherwise doing well.

Dr. Badruddoja noted Murchison did not have the MRI or lab work completed and recommended that he still do both. (AR 258–59). Dr. Badruddoja also recommended Pristiq as an alternate medication. (AR 258).

On October 19, 2012 Murchison was seen by Dr. Rogers and requested disability paperwork stating that he was still taking medication for narcolepsy. (AR 264). Murchison reported that his medications did not provide complete relief and that narcolepsy prevented him from driving and interfered with his work. Findings on exam included normal mood and narcolepsy, unchanged.

On March 1, 2013 Murchison saw Dr. Rogers to have disability paperwork completed. (AR 291). Murchison stated that he could drive short distances but someone drove him to and from Phoenix to attend law school. He reported falling asleep occasionally in class and often while reading, and fell asleep while talking on the phone. Murchison also reported a six month history of weakness in his thighs that occurred late in the day, three times a week. He was worried about losing his prescription benefits and not being able to afford Provigil. Dr. Rogers assessed limb weakness, numbness, and narcolepsy (unchanged), and recommended Murchison see Dr. Eichling for a second opinion. (AR 292).

On May 17, 2013 Murchison saw Dr. Rogers to have paperwork completed for his insurance benefits. (AR 289). Murchison reported he was on leave from his job as a teacher because he had to drive too far to the school and the district would not accommodate him. Murchison stopped taking Nuvigil because it was too expensive and did not help much; he had not seen Dr. Puri in a year.

On October 24, 2014 Murchison saw Dr. Puri for a follow-up and because he needed supportive evidence because his disability benefits were ending. (AR 316). Dr. Puri noted Murchison was quite upset because his insurance company would not cover the Provigil; he was having trouble concentrating in class, falling asleep in class, and could not finish tests in time. Dr. Puri noted that Murchison:

> has had considerable workup, demonstrating narcolepsy with cataplexy syndrome. This is a disorder, in which patients are

quite disabled, usually with severe sleepiness. They can have sleep/drop attacks during the day. Concentration is difficult because of micro sleep episodes. And hence task/test completion can be a problem. With cataplexy, patients can have drop attacks with specific stimulation/emotion. This also with altered his ability to perform his job effectively.

Dr. Puri recommended that:

> Because of his narcolepsy with cataplexy, [Murchison] has considerable trouble keeping up with a schedule, staying awake in class, concentrating and finishing testing material in time. Accommodation, should be made to give him extra time. Furthermore he may need further support from his long-term disability, for those reasons.

### B. State Agency Consulting Physicians

On August 16, 2013 Murchison was seen by Dr. Sticken for a psychological evaluation. (AR 310). Murchison reported narcolepsy and chronic fatigue, and symptoms of depression because of his narcolepsy including depressed mood, loss of pleasure, loss of appetite, excessive sleep, loss of energy, and fatigue. Murchison also reported anxiety and a few panic attacks, feeling restless and on edge, muscle pain, difficulty concentrating and being easily distracted, and very poor memory. Murchison said that he had not been on any medications since November 2012 because they were too expensive for him. (AR 312).

On exam, Dr. Sticken noted that Murchison was cooperative with a normal mood and appropriate affect. (AR 310). He scored 29/30 on the Mini Mental State Exam, his ability to pay attention and concentrate was within normal limits, his immediate recall was normal, and his delayed recall was slightly compromised. (AR 311). Dr. Sticken assessed depressive disorder and anxiety disorder and assigned a GAF score of 50, and noted that the associated symptoms appeared to be causing Murchison a moderate degree of difficulty in his ability to function on a daily basis. (AR 312–313). She also diagnosed narcolepsy, muscle tension and weakness, headaches, and chronic fatigue per patient report. (AR 312).

Dr. Sticken completed a Medical Source Statement and opined that Murchison's

psychological limitations were expected to last for 12 continuous months. (AR 314). She found mild limitations in his ability to understand and remember simple and detailed instructions, moderate limitations in ability to carry out simple instructions and maintain attention, concentration, and attendance on a regular basis, and no limitations in social interaction or adapting to change.

### C. State Agency Reviewing Physicians

On January 16, 2013 DDS physician Dr. Payne made an initial determination that Murchison was not disabled. (AR 57). Dr. Payne completed a RFC assessment with a recommendation that Murchison avoid even moderate exposure to hazards. (AR 63). DDS Examiner Jennifer McClellan found that Murchison could not return to his PRW due to his narcolepsy but could perform other work. (AR 73).

On reconsideration, Murchison was again found not disabled on September 3, 2013. (AR 75). DDS physician Dr. Boatman made the same RFC assessment as Dr. Payne (AR 85). Dr. RC completed a psychiatric review and found that Murchison had moderate difficulties in maintaining concentration, persistence, or pace, and no other difficulties under the Paragraph B criteria. (AR 84). Dr. RC also completed a mental RFC assessment with the following limitations: moderate limitations in ability to maintain attention and concentration for extended periods, some difficulty concentrating secondary to depression and anxiety, can perform complex tasks, can relate to others, can adapt to a work situation, and mild to moderate issues with concentration require limitations from working with dangerous machinery. (AR 88). DDS Examiner Diane J again found that Murchison did not have the RFC to perform his PRW but could do other work. (AR 89–90).

### D. Plaintiff's Testimony

On a Disability Report dated September 28, 2012 Murchison reported that he stopped working on May 2, 2012 because of his narcolepsy and chronic fatigue. (AR 174). He tried various medications but none had worked effectively (AR 178), and his doctor ordered a MRI to determine why his medications were not working but insurance

refused to cover it as medically unnecessary because his narcolepsy was already diagnosed (AR 177). Murchison reported that he could not stay awake during class, lost his train of thought and fell asleep at his desk, and that the school district refused to accommodate him. (AR 180). He was trying to get training in another field so that he could return to the workforce.

On a Disability Report dated February 21, 2013 Murchison reported that his narcolepsy had gotten far worse over the last four months: he fell asleep in the middle of conversations, had a difficult time concentrating, dozed off if sitting still too long, and started to fall over in the shower. (AR 183). He was also losing his balance more often and had severe headaches made worse by his medication. Due to his increased problems, he rarely drove because he dozed off at red lights, and because of the cataplexy he nearly collapsed when walking. (AR 183–84). Murchison also reported that he had to be careful showering and cooking due to dizziness and cataplexy, that he took more naps and had to pull over and rest when driving, and that he was going to start counseling because he was depressed due to his inability to provide for his family. (AR 188). He felt it would be extremely difficult for him to conduct his duties as a teacher, but would work if he could find another profession that would accommodate his conditions. (AR 184, 189).

On a Function Report dated June 27, 2013 Murchison reported that his narcolepsy and cataplexy had gotten worse: extreme fatigue made standing difficult, his concentration was impaired, he lost his train of thought when teaching, he fell asleep and mid conversation and woke up exhausted, and driving was dangerous. (AR 191–92) He also had an increase in headaches and agitation. (AR 191). Before his illness, he could garden more, work on the roof, lecture longer, and drive long distances. (AR 192). He was able to prepare meals but his fiancé did most of the cooking, and he helped with laundry, ironing, and taking care of their daughter. (AR 192–93). Murchison stated that his hobbies were reading, gardening, and watching tv, but that he had trouble concentrating when reading and sometimes fell asleep when watching tv. (AR 195). His illness affected his ability to lift, stand, walk, climb stairs, see, remember, complete tasks,

and concentrate, but he was able to follow written and spoken instructions and generally finished what he started. (AR 196).

On a Disability Report dated October 12, 2013 Murchison reported that his narcolepsy and cataplexy were worse and the added stress was causing severe mood swings. (AR 200). He was constantly agitated, the fatigue contributed to depression, it was harder to concentrate, and his memory was worse. Physically he was weaker and had more trouble lifting items and had to take more breaks when doing chores. Because of his increased symptoms, he did less walking, reading, and chores, almost never went out with friends, and rarely drove. (AR 202).

At the hearing before the ALJ, Murchison testified that he took a leave of absence from teaching in May 2012 because he was having trouble staying awake while driving and would fall asleep at red lights, and the district refused to relocate him to a school closer to his home. (AR 35). He was also having trouble staying awake in class, remembering things, and concentrating. Murchison stated that he could not predict when he was going to get fatigued; it would happen at a different time each day. (AR 40). He took several short naps a day, whenever he couldn't think clearly, and some days he needed more naps than others.

The first medication that he tried caused a lot of side effects, and the second one would work better some days than others. (AR 35–36). He also tried adding Ritalin, which helped him focus more but gave him tunnel vision. (AR 36, 41).

Murchison testified that he lost his insurance in October 2012 after he stopped teaching and that he had not been taking medication for two years because it cost $2,200 a month. (AR 31, 36). He did not have the money to go back to his treating physicians because he had to pay out of pocket. He did obtain insurance through the state recently and scheduled a follow-up appointment with Dr. Puri for April 2015. (AR 31, 36).

On a typical day, he gets up at 6:30 or 7 to get the kids ready for school, feeds the chickens, goes to school, comes home to rest, picks up the girls, and does something at the house. (AR 42). He tries to stay active because he has problems when he is stationary

for long periods of time, and can only drive short distances.

At the time of the hearing, Murchison had been attending law school fulltime for three years. (AR 37). He started school in Phoenix and had time between classes to rest, but still had problems in class. In his second year he took two classes a day, four days a week, with time in between to rest. (AR 38). Currently he was studying for the bar exam and participating in a prosecution clinic for a few hours a day. The first summer of law school he clerked for a judge, and the second summer he worked as an attorney for foster kids.

Murchison stated that he would love to teach law if he was hired, but that he could not teach at the high school level because if he fell asleep in class it would be a liability issue for the school. (AR 39). He hoped he could find a job that would accommodate his needs. Murchison also stated that he was applying for disability because the state required him to, and that he wanted to work and do well. (AR 43).

E.      Lay Testimony

At the hearing before the ALJ, Murchison's fiancé, Billie Lee Salas, testified that Murchison's biggest issue was "his propensity to fall asleep without any warning." (AR 52). She had seen him fall asleep while standing and driving, and he would fall asleep if sitting for long periods. (AR 52–53). Sometimes you could wake him up easily, and sometimes he slept for a few minutes or an hour. (AR 53–54). Salas stated that Murchison's cataplexy would cause him to get dizzy and he would stumble or fall over, that he got confused easily and would forget things, and got bad migraines. (AR 53). The cataplexy also affected his mood and he got grumpy or short-tempered.

F.      Vocational Testimony

At the hearing before the ALJ, Ms. McAlpine testified as a vocational expert. She stated that Murchison's past work as a high school and college teacher was classified as light and skilled, and his work as a pizza delivery driver was medium and unskilled. (AR 47).

The ALJ asked McAlpine to assume an individual with Murchison's education

and past work experience and the following limitations: avoid moderate exposure to unprotected heights and hazardous machinery, can perform complex tasks, can relate to others, can adapt to work situations, and has mild to moderate issues with concentration that preclude working with dangerous machinery. (AR 48–49). McAlpine testified that such a person could do Murchison's past work. (AR 49).

For the second hypothetical, the ALJ added an additional limitation that the person would be off task five percent of the workday, and McAlpine testified that the person could still do the teaching job. (AR 49). In the third hypothetical, the ALJ increased the limitation to being off task ten percent of the workday, and McAlpine testified that such a person could not be a teacher. McAlpine further testified that such a person could perform other work existing in the national economy such as janitorial work.

McAlpine also testified that someone who was off task 10–15 percent of the workday could not perform work as an attorney, but someone off task less than 10 percent of the workday could. (AR 50).

G.    ALJ's Findings

The ALJ found that Murchison had the severe impairments of narcolepsy and headaches. (AR 15). The ALJ noted that while the medical records indicated Murchison also had lumbar radiculopathy and neck strain, these impairments were non severe because he did not receive any consistent or aggressive treatment for them, and they did not cause more than a minimal effect on Murchison's ability to work. (AR 15–16). The ALJ also found that Murchison's impairments of depressive disorder and anxiety disorder were non severe because they caused no more than minimal limitations on his ability to work and he did not receive any mental health treatment. (AR 16).[4]

The ALJ found that Murchison's statements concerning the intensity, persistence,

---

[4] The ALJ also considered the Paragraph B criteria set out in the social security disability regulations for evaluating mental disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00. To satisfy the paragraph B criteria, the mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. *Id.* The ALJ found Murchison had no limitation in activities of daily living, no limitation in social functioning, mild limitation in concentration, persistence, or pace, and no episodes of decompensation of extended duration. (AR 16–17).

and limiting effects of his symptoms were not entirely credible because although he alleged problems with sleepiness and concentration, he was attending law school fulltime, and his ADL (such as studying for the bar exam, having legal jobs, and taking care of his children), showed that his impairments were not as limiting as he suggested. (AR 19–20). The ALJ also found that the medical evidence did not reveal a significant increase in symptoms since the AOD and did not support the degree of limitation Murchison alleged, and that his treatment had been relatively routine and conservative, consisting mostly of prescription medications and intermittent follow-up visits. (AR 20–21). Finally, the ALJ noted that given Murchison's "allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating doctor. Yet . . . restrictions were not recommended . . . with any consistency or over any extended duration." (AR 21).

The ALJ gave little weight to the state agency psychological consultant at the reconsideration level because Dr. RC's opinion that Murchison had a severe mental impairment and moderate difficulties in concentration, persistence, or pace was not supported by the medical evidence of record. (AR 18). The ALJ noted that she did incorporate the limitations from Dr. RC's opinion in the RFC assessment, but the limitations resulted from Murchison's narcolepsy and headaches, not a mental impairment.

The ALJ also gave little weight to the psychological consultative examiner, Dr. Sticken, because Dr. Sticken's opinion that Murchison had moderate limitations in his ability to carry out simple instructions, maintain attention and concentration, and maintain regular attendance was not supported by Murchison's sparse mental health treatment or the ALJ's paragraph B analysis. (AR 18). The ALJ further noted that she gave little weight to Dr. Sticken's GAF assessment of 50 because it reflected "only a snapshot of impaired and/or improved behavior" and more weight was "given to the objective details and chronology of the record, which more accurately describes the claimant's impairments and limitations." *Id.*

The ALJ gave great weight to the state agency medical consultants who opined that Murchison had to avoid even moderate exposure to hazards because the recommendation was consistent with his documented symptoms of narcolepsy. (AR 21). The ALJ noted that she also incorporated additional driving restrictions to accommodate Murchison's subjective statements.

The ALJ gave little weight to the letter from the Arizona State Retirement System Long Term Disability Program because the definition of "total disability" used on the form was unlikely the same as the SSA's definition, and whether a claimant is disabled is a determination reserved to the Commissioner. (AR 21); *see* 20 C.F.R. § 416.904.

The ALJ found that Murchison had the RFC to perform a full range of work at all exertional levels with the following nonexertional limitations: avoid moderate exposure to unprotected heights and hazardous machinery, cannot perform commercial driving, can perform complex tasks, can relate to others, can adapt to work situations, mild to moderate issues with concentration related to narcolepsy and headaches that preclude working with dangerous machinery, and would be off task five percent of the workday due to sleepiness. (AR 19).

The ALJ found that Murchison could perform his PRW as a high school and college teacher as generally performed. (AR 22). The ALJ therefore concluded Murchison was not disabled. *Id.*

### III.    Standard of Review

The Commissioner employs a five-step sequential process to evaluate SSI and DIB claims. 20 C.F.R. §§ 404.920, 416.1520; *see also Heckler v. Campbell*, 461 U.S. 458, 460–462 (1983). To establish disability the claimant bears the burden of showing he (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment meets or equals the requirements of a listed impairment; and (4) the claimant's RFC precludes him from performing his past work. 20 C.F.R. §§ 404.920(a)(4), 416.1520(a)(4). At Step Five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in substantial numbers in the

national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, she does not proceed to the next step. 20 C.F.R. §§ 404.920(a)(4), 416.1520(a)(4).

Here, Murchison was denied at Step Four of the evaluation process. Step Four requires a determination of whether the claimant has sufficient RFC to perform past work. 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as that which an individual can still do despite his limitations. 20 C.F.R. §§ 404.1545, 416.945. A RFC finding is based on the record as a whole, including all physical and mental limitations, whether severe or not, and all symptoms. Social Security Ruling (SSR) 96-8p. If the ALJ concludes the claimant has the RFC to perform past work, the claim is denied. 20 C.F.R. §§ 404.1520(f), 416.920(f).

The findings of the Commissioner are meant to be conclusive. 42 U.S.C. §§ 405(g), 1383(c)(3). The court may overturn the decision to deny benefits only "when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). As set forth in 42 U.S.C. § 405(g), "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Valentine*, 574 F.3d at 690 (internal quotation marks and citations omitted), and is "more than a mere scintilla, but less than a preponderance." *Aukland*, 257 F.3d at 1035. The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998) (internal citations omitted). "Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." *Aukland*, 257 F.3d at 1035 (internal quotations and citations omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir.

1995). "When the evidence before the ALJ is subject to more than one rational interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (internal citations omitted).

Additionally, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). The claimant bears the burden to prove any error is harmful. *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (citing *Shinseki v. Sanders*, 556 U.S. 396, 129 S. Ct. 1696, 1706 (2009)). An error is harmless where it is "inconsequential to the ultimate nondisability determination." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (internal citations omitted); *see also Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006). "[I]n each case [the court] look[s] at the record as a whole to determine whether the error alters the outcome of the case." *Molina*, 674 F.3d at 1115. In other words, "an error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the validity of the ALJ's ultimate conclusion." *Id.* (internal quotation marks and citations omitted). Finally, "[a] claimant is not entitled to benefits under the statute unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be." *Strauss v. Comm'r Soc. Sec.*, 635 F.3d 1135, 1138 (9th Cir. 2011).

## IV.    Analysis

Murchison argues that the ALJ's decision was not based on substantial evidence because the ALJ failed to properly evaluate the medical evidence from Murchison's treating physicians, and because the hypothetical to the VE did not include all of Murchison's limitations. (Doc. 17). Murchison requests that the Court remand this matter for further proceedings. (Doc. 17 at 16).

The Commissioner argues that the Court should affirm the ALJ's decision because the ALJ properly considered the medical evidence in evaluating the severity of

Murchison's impairments and properly found that Murchison's impairments did not meet a listed impairment. The Commissioner further argues that substantial evidence supports the ALJ's RFC finding and that the ALJ included all credible limitations in her hypothetical to the VE. Finally, the Commissioner contends that the ALJ fulfilled her obligation to develop the record.

The Court finds no error in the ALJ's assessment of the treating physician opinions. The Court further finds that the ALJ did not err by failing to include additional limitations in the RFC assessment. Accordingly, the Commissioner's decision will be affirmed.

### A.    Treating Physician Opinions

Murchison first argues that the ALJ erred by failing to properly evaluate the medical evidence offered by his treating physicians, Drs. Rogers and Puri. (Doc. 17 at 4). Murchison also incorrectly alleges that the ALJ gave Dr. Rogers' opinion little weight. *Id.* at 10.[5]

In weighing medical source opinions in Social Security cases, the Ninth Circuit distinguishes among three types of physicians: (1) treating physicians, who actually treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Lester*, 81 F.3d at 830). "While the opinion of a treating physician is thus entitled to greater weight than that of an examining physician, the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.

Here, the ALJ did not assign a specific weight to the opinions of Drs. Puri or Rogers. Rather, she summarized the information from each of the treating physicians,

---

[5] The Court notes that Murchison's Opening Brief and Reply contain a number of false and misleading statements regarding the medical evidence, hearing testimony, and the ALJ's written decision.

including appointments from the years prior to Murchison's AOD. "The Secretary, however, need not discuss all evidence presented to her. Rather, she must explain why 'significant probative evidence has been rejected.'" *Vincent on Behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394–95 (9th Cir. 1984) (quoting *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981)). Thus, because the ALJ did not actually reject the treating physician opinions, she was not required to give specific and legitimate or clear and convincing reasons for discounting the opinions. *See Lester*, 81 F.3d at 830 (where a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons); *Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." (internal quotations and citations omitted)). Accordingly, the Court finds that the ALJ's summary of the medical record is adequate to meet the requirement that "an examiner's findings should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based, so that a reviewing court may know the basis for the decision." *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (quoting *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979)).

Further, there are no contradictions in the opinions of Murchison's treating physicians and the DDS physicians. At both the initial and reconsideration levels, the DDS physicians opined that Murchison must avoid even moderate exposure to hazards such as heights and machinery due to his narcolepsy. (AR 63, 85). No other exertional or environmental limitations were recommended. The medical evidence from Murchison's treating physicians consists primarily of Murchison reporting his subjective symptoms and the doctors recommending medication changes, and there are few recommendations for specific accommodations or limitations. For example, a letter from Pima Lung & Sleep to TUSD following a February 11, 2011 appointment recommends that Murchison be transferred to a school closer to his home due to developing excessive sleepiness while

driving. (AR 244). At an October 24, 2014 appointment, Dr. Puri noted that, "[b]ecause of his narcolepsy with cataplexy, [Murchison] has considerable trouble keeping up with a schedule, staying awake in class, concentrating and finishing testing material in time. Accommodation, should be made to give him extra time. Furthermore he may need further support from his long-term disability, for those reasons." (AR 316). The ALJ reasonably incorporated these opinions into the RFC assessment by finding that Murchison must avoid moderate exposure to heights and hazardous machinery, could not perform commercial driving, had mild to moderate issues with concentration related to narcolepsy, and would be off task five percent of the workday due to sleepiness. (AR 19).

Accordingly, the Court finds that the ALJ did not err in evaluating the medical evidence from Murchison's treating physicians.[6]

---

[6] Murchison also presents a side issue regarding the ALJ's consideration of his lack of medical treatment. Murchison states that the ALJ used his limited treatment record as a basis for the denial, and argues that the record shows that the prescribed medications did not work and caused side effects, and insurance refused to cover the cost of a MRI. (Doc. 17 at 7). Murchison also notes that he had no insurance for two years and was unable to afford the cost of medication on his own, and that after he obtained AHCCCS, it refused to cover his medication. *Id.* at 8. Murchison does not point to any evidence or make any claims that he was prescribed additional treatments that AHCCCS would not cover.

"[I]f a claimant complains about disabling pain but fails to seek treatment, or fails to follow prescribed treatment, for the pain, an ALJ may use such failure as a basis for finding the complaint unjustified or exaggerated." *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007). However, "[d]isability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds." *Id.* (*quoting Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995)). The ALJ "'must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment' including inability to pay . . ." *Orn*, 495 F.3d at 638 (*quoting* SSR 96-7p at 7–8).

As the ALJ discussed in her decision, Murchison's "treatment has been relatively routine and conservative, mostly consisting of prescriptions medications and intermittent follow-up visits with his treating providers." (AR 21). And, "given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating doctor. Yet . . . restrictions were not recommended by his treating providers with any consistency or over any extended duration." *Id.*

The Court finds that the ALJ's opinion accurately characterizes the medical evidence. While Murchison did experience some side effects from his medications (AR 234, 245), he also reported improved symptoms (AR 238, 242, 258), and on several

- 19 -

### B. Hypothetical to VE

The ALJ's non-disability finding resulted from the presentation of a hypothetical RFC to the VE, and the VE's testimony regarding Murchison's ability to perform his PRW. Murchison argues that the ALJ's hypothetical to the VE did not properly incorporate all of his subjective limitations and conditions; he does not specify what additional limitations he believes should have been included. (Doc. 17 at 15).

RFC is "the most [a claimant] can still do despite [his] limitations," and includes assessment of the claimant's "impairment(s), and any related symptoms, such as pain, [which] may cause physical and mental limitations that affect what [he] can do in a work setting." 20 C.F.R. § 404.1545(a)(1). The Commissioner retains the ultimate responsibility for assessing a claimant's RFC. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). The ALJ was required to assess Murchison's RFC based on all the record evidence, including medical sources, examinations, and information provided by Murchison. 20 C.F.R. §§ 404.1545(a)(1)-(3), 416.945(a)(1)-(3). However, the ALJ need not include all possible limitations in her assessment of what a claimant can do, but rather is only required to ensure that the RFC "contain[s] all the limitations that the ALJ found credible and supported by the substantial evidence in the record." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005); *Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006).

The Court finds that the ALJ adequately accounted for Murchison's narcolepsy in

occasions Dr. Puri recommended that Murchison needed to take his medications consistently to see results (AR 237, 241) or consider alternate medications (235, 241, 250, 258, 267). And, as discussed above, the treating providers recommended few limitations or accommodations for Murchison's conditions. While Murchison may have been without insurance for some period of time, in the time period that he did have AHCCCS or other insurance coverage, he sought only minimal treatment for his alleged impairments, and the ALJ could properly take this into consideration when determining Murchison's credibility and the extent of his allegedly disabling conditions. *See Orn*, 495 F.3d at 638; *Leal v. Astrue*, 2009 WL 800935, at *6 (E.D. Cal. Mar. 25, 2009) ("Claimant's lack of treatment-seeking behavior for an allegedly disabling problem, at a minimum, creates considerable uncertainty about the veracity of Claimant's subjective complaints . . .").The Court finds no evidence in the record that the ALJ improperly considered Murchison's lack of treatment or inability to afford medication when making her disability determination.

the hypotheticals presented to the VE. In each scenario, the ALJ asked McAlpine to assume an individual who must avoid moderate exposure to unprotected heights and hazardous machinery, is precluded from commercial driving, and has mild to moderate issues with concentration that preclude working with dangerous machinery. (AR 48–49). Additionally, in the second hypothetical, the ALJ added an additional limitation that the person would be off task five percent of the workday. (AR 49). These limitations reflect the recommendations by the DDS examiners that Murchison must avoid even moderate exposure to environmental hazards, as well as Dr. Puri's notation for the law school that "[b]ecause of his narcolepsy with cataplexy, [Murchison] has considerable trouble keeping up with a schedule, staying awake in class, concentrating and finishing testing material in time. Accommodation, should be made to give him extra time." (AR 316). Murchison does not offer any evidence to controvert the limitations presented in the hypotheticals to the VE, and the Court concludes that the ALJ's RFC assessment is a reasonable finding grounded in the administrative record.[7]

## V.    Remedy

A federal court may affirm, modify, reverse, or remand a social security case. 42 U.S.C. § 405(g). Absent legal error or a lack of substantial evidence supporting the ALJ's findings, this Court is required to affirm the ALJ's decision. After considering the record as a whole, this Court simply determines whether there is substantial evidence for a reasonable trier of fact to accept as adequate to support the ALJ's decision. *Valentine*, 574 F.3d at 690. Here, the record contains sufficient substantial evidence to meet this standard. The Court concludes that the ALJ's findings are supported by substantial evidence and there is no legal basis for reversing or remanding her decision. Therefore,

_____

[7] To the extent that Murchison challenges the ALJ's credibility finding in relation to this issue, the Court finds no error. The ALJ gave specific reasons for discounting Murchison's credibility such as inconsistencies between Murchison's alleged excessive sleepiness and inability to concentrate and the fact that he attended law school fulltime, was studying for the bar exam, participated in a legal clinic, and worked at legal jobs. (AR 20). Thus, to the extent that Murchison alleges greater subjective limitations regarding his ability to maintain focus and concentration, the ALJ was not required to include limitations in the RFC and hypothetical that she did not find credible and supported by substantial evidence in the record.

Murchison is not entitled to relief.

## VI. Conclusion

In light of the foregoing, **IT IS HEREBY ORDERED** that the decision of the Commissioner of Social Security is **affirmed**. The Clerk shall enter judgment accordingly and close its file on this matter.

Dated this 26th day of February, 2018.

_____
Eric J. Markovich
United States Magistrate Judge